UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK          Docket No.:
--------------------------------------------------------X
ROY TRUJILLO,

                Plaintiff,

        - against -          **COMPLAINT**

TRANSPERFECT GLOBAL, INC. ,
TRANSPERFECT TRANSLATIONS
INTERNATIONAL, INC. and
ELIZABETH ELTING,
                Defendants.
--------------------------------------------------------X

      Plaintiff, by his attorneys, The Law Offices of Jason L. Abelove, complaining of the

Defendants, allege as follows:

### INTRODUCTION

1.    This is a proceeding for damages pursuant to Defendants'  intentional and willful

      withholding of wages and Defendants' retaliation against Plaintiff for his complaints

      regarding Defendants' refusal to pay wages pursuant to common law breach of contract, the

      Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 206, 207 (1988), the New York State

      Labor Law, violations of the New York State Wage Theft Prevention Act ("WTPA") sections

      195(1) and 195(3)  and related statutes, and Intentional Infliction of Emotional Distress.

2.    Plaintiff seeks declaratory and injunctive relief; an award of money damages for the

      economic losses caused by Defendant's unlawful conduct, including lost wages and

      compensation; an award of liquidated damages under the FLSA and Labor Law; statutory

      damages pursuant to the WTPA; prejudgment interest; Plaintiff's reasonable attorney's fees;

      costs of this action; and any such other and further relief this Court deems just and equitable.

## STATEMENT PURSUANT TO LOCAL RULE 1.9

3.    For the purposes of complying with Local Rule 1.9, the Plaintiff states that he has no corporate parent, subsidiary or affiliate and that there are no other interested parties.

## JURISDICTION AND VENUE

4.    The jurisdiction of the Court over this controversy is based upon Federal Question jurisdiction, 28 U.S.C. § 1331 whereas the district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States.

5.    Venue is proper in the Southern District per 28 U.S.C. §1391, as Defendant's principal place of business is in the Southern District of New York and a substantial part of the events giving rise to Plaintiff's claims occurred in the Southern District of New York.

## THE PARTIES

6.    Plaintiff Roy Trujillo ("Trujillo" or "Plaintiff"), at all times hereinafter mentioned, was and still is a resident of the State of New Jersey residing in the County of Essex, and later the County of Monmouth.

7.    Upon information and belief, Defendant TransPerfect Global, Inc. ("TGI") is a Delaware Corporation authorized to do business in the state of New York with a principal place of business in the State of New York, County of New York.

8.    Upon information and belief, Defendant TransPerfect Translations International, Inc. ("TTI") is a New York Corporation with a principal place of business in the State of New York, County of New York.  (TGI and TTI are collectively referred to as "Defendants", "TransPerfect" or the "Company").

9.      Upon information and belief, Defendant Elizabeth Elting ("Elting") is a co-CEO of TransPerfect with a principal place of business within State of New York, County of New York.

10.     At all times relevant to this action, Defendants were an "enterprise" and an "enterprise engaged in interstate commerce" as defined by the FLSA, 29 U.S.C. §§ 203(r) and (s), and, thus, an entity covered by the FLSA.

11.     Defendants have (a) employees engaged in commerce or in the production of goods for commerce, or has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and (b) an annual gross volume of sales in excess of $500,000.00.

12.     At all times relevant to this action, Plaintiff was an individual affecting interstate commerce by and through his work performed on behalf of Defendants through his handling of goods that traveled through interstate commerce and his assignment in multiple states.

13.     At all times relevant to this action, Plaintiff was an "employee" of Defendants within the meaning of applicable federal and state statutes and regulations.

## FACTUAL ALLEGATIONS

14.     TTI, together with its parent TGI and other subsidiaries, is the largest privately owned language services firm in the world, providing professional translation and related services to a wide range of customers around the globe.

15.     The Company serves thousands of customers, including Google, Walmart, Bank of America, Shell Oil and Goldman Sachs.  TransPerfect has over 100 offices in 36 countries, employs more than 3,500 employees, and maintains a network of more than 10,000 translators, editors and proofreaders working in more than 170 languages.

16. The Company has been extremely successful, generating over $500 million in gross revenues and earning approximately $60 million in gross profits in 2015, and has consistently grown its revenues and earnings every year since its formation.

17. TransPerfect was founded in 1992 by Philip Shawe ("Shawe") and Elizabeth Elting ("Elting"), who remain the principal shareholders and still serve as its co-Chief Executive Officers and sole elected directors.

18. When they created the Company, Shawe and Elting were roommates and classmates at the NYU Stern Graduate School of Business in New York City ("NYU"). The young couple essentially started the Company out of their dorm room.

19. By 1996, the Company was growing rapidly and Shawe and Elting became engaged to be married, however, the engagement lasted for only a year. In 1999, Elting married a former boyfriend but she and Shawe continued working together and continued to build the Company.

20. At the time TransPerfect began out of that dorm room, Plaintiff was a Resident Assistant. Trujillo, a Hispanic American, was very helpful to Shawe and Elting in starting and growing the Company.  In fact, some of the original start-up office equipment, which included a Wang personal computer, a printer and a fax machine, was charged to Plaintiff's personal credit card.

21. Elting had enormous admiration and respect for Trujillo, which was summed up well in a speech she wrote and gave to NYU alumni in mid-2011:

*One of our dearest friends, Roy Trujillo, who was still on the NYU meal plan would come visit with Phil and me bearing wonderful gifts - muffins and cold pizza from the cafeteria! Roy has been a critical part of our growth and is now the Chief Operating Officer of the Company.*

22.    After graduating from NYU, Trujillo turned down numerous banking and investment banking job offers, electing instead to return to his native State of New Mexico to run a start-up natural food company.  During his very successful tenure at the firm it grew over 1,500%, however, the challenge of helping a larger, fast growing company became increasingly appealing.

23.    After six years Trujillo joined Shawe and Elting at TransPerfect in early 2000.  At that time, Shawe and Elting formally elected Plaintiff to be the Chief Operating Officer and Secretary of Translations.com, Inc., which would be merged into the Company approximately four years later.  Plaintiff was then formally elected to be the Chief Operating Officer and Secretary of the Company, and he has served the Company in those positions to this day.

24.    Further, Trujillo was issued stock in the subsidiary, Translations.com.  Translations.com later merged into TransPerfect.  Plaintiff was forced to sell as a result of the Delaware Short Form Merger Act and therefore no longer has the financial upside those shares represented (approximately $2.7 Million).

25.    Trujillo is the only employee of the Company, other than Shawe and Elting, elected by the Directors.  His responsibilities at the Company have been very broad and extensive, involving oversight of virtually all of the Company's operations except sales.  Currently, he directly oversees more than 100 employees (most of whom are black, Asian or Hispanic) in the areas of accounts payable, accounts receivable, accounting analysis, collections, legal, real estate and construction, reception, mail rooms, procurement, supplies, logistics and travel.

26.    In addition, he is closely involved with other aspects of the business, including production and human resources. For many years, he also served as temporary Chief Financial Officer of the Company.

27.    From 2000 through 2011, Trujillo worked closely with both co-CEOs and frequently spent more time with Elting than with Shawe.

28.    Shawe has always been the true visionary leader.  He is the real managing and operating co-CEO of the Company, intimately involved with running its day-to-day operations, and was responsible for the more than 20 acquisitions made by the Company which propelled its revenues and profits, making TPG an industry leader.  The impact of these acquisitions is not easily measured as the technologies, technical developments and management skills acquired affect every division and every aspect of the business making the Company more efficient, facilitated scalability and enhanced profitability.  Trujillo played a crucial role in many of these acquisitions, determining valuations, negotiating purchases, conducting due diligence, evaluating talent and integrating the operations into the Company.

29.    Trujillo has always and continues to maintain a positive and professional relationship with Shawe.

30.    For many years, Trujillo had a similar professional relationship with Elting, however, what began and continued as a congenial work environment for Trujillo at the Company for many years, morphed into something very different beginning in late 2011.

31.    In late 2011 and greatly escalating thereafter, Elting came to use Trujillo as a pawn in an extraordinary 'scorched earth' initiative with the ultimate desire of trying to extract as much money from the Company as possible by demanding many millions of dollars in

distributions, and then, along with her advisors, creating and executing on multiple schemes in continuing attempts to force a sale of the whole Company to the highest bidder.

32. In October, 2013, Elting stepped up her efforts to achieve her goal when she hired attorneys Ron Greenberg and Phil Kaufman of Kramer, Levin and Mark Segall (a former Kramer Levin associate) of Kidron Advisors, in order to achieve her ultimate goal of maximizing the amount of money she could extract from her 50% ownership stake in the company.

33. Elting had never agreed to a buy/sell agreement.  To achieve maximum value, she and her advisors concluded that they had to be able to sell 100% of the Company to a third party and could only do that by first forcing Shawe off the Board, then using her position as sole remaining CEO to extract huge distributions (without any regard to the well being, working capital requirements, or continued growth of the Company), and then putting the Company up for sale.

34. In September, 2011 when Shawe got married in California, Elting surprisingly did not attend the wedding.  Elting's absence was particularly noticeable considering that almost 200 other fellow employees of the Company attended.  More telling was an e-mail she wrote a few months after the wedding when she discovered that Shawe had used company frequent flier miles to fly to California.  In the e-mail, Elting wrote that Shawe had his priorities screwed up and that she no longer wanted to be business partners with him.  All this involved an emotion-laden change in her attitude towards Shawe and senior management (including Plaintiff) that was driven by jealousy and greed.

35. Elting alone, and subsequently with her team of advisors, formulated a highly aggressive four-pronged approach toward Shawe and the Company, consisting of four objectives: (i) obtaining the highest price for her interest in the Company; (ii) preventing Shawe from

buying her out and only seeking bids from third party buyers; (iii) in the interim, obtaining the largest possible amount of ongoing cash distributions from the Company; and (iv) inflicting as much pain as possible upon Shawe, and those employees who would not proclaim loyalty to her instead of Shawe (which was almost all of the Company's 3500 employees).[1]

36.    In order to meet the first two objectives and get the highest price for her half of the Company, Elting had to sell to a third party other than Shawe, and have the ability to sell 100% of the company, thereby obtaining Total Enterprise Value.

37.    The third objective for cash distributions (far beyond what they had traditionally amounted to over the years) was fueled by Elting's, her insatiable desire for money, to purchase an extravagant second home in the Hamptons, to pay her personal taxes, and other purposes, rather than allow the Company to use such funds for acquisitions, which always fueled its growth, and maintain its minimum capital requirements.

38.    While the fourth objective of Elting's four-pronged approach served the first three objectives, it also reflected an element of unbridled rage against Shawe and those like Plaintiff, that she viewed as supporting him.  Executing initiatives advanced by Shawe and/or disagreeing with a position of Elting, even if her position breached a fiduciary responsibility, was not in the best interest of the Company, or was contrary to the Company's Core Values, was deemed support of Shawe and often resulted in punishment in the form of harassment, abuse, slander,

---

[1] On April 26, 2016, over 600 employees of the Company from around the world signed and submitted a letter addressed to Justice Bouchard of the Delaware Chancery Court stating that they spoke for the majority of the 3,500+ employees in confirming their desire to prevent a sale of the Company and their allegiance to Shawe as a crucial and necessary leader of the Company.

humiliation and financial cost.  This was particularly true of Plaintiff, who Elting inflicted with as much abuse, harassment and humiliation as possible.

39.    Signs of Elting's disregard of her fiduciary duties and obligations to the Company date back as early as 2003.  At that time she unilaterally placed her personal housekeeper on the Company's payroll as an "executive assistant" where she remained for over a decade, imposing on the Company inappropriate FICA payments, wages, and health insurance costs. Such payments and costs amounted to hundreds of thousands of dollars over the years.

40.    In 2005, an independent management consultant for the Company reviewed the Company's internal financial controls and determined that the then Controller, Gale Boodram ("Boodram"), lacked prerequisite experience, expertise and credentials and wielded an unusual amount of power and control.  They further noted that Boodram posed a significant risk to the Company. She was thereafter demoted, but remained as a key financial assistant to Elting for almost another decade.  Boodram effectively became a personal financial assistant to Elting and did Elting's financial bidding even though objected to by Shawe, Plaintiff, the CFO, the consultant and others.

41.    Boodram was an illegal immigrant (known as such by Elting, but hidden from others including Plaintiff and thereby making Elting and, in turn, the Company complicit of violating federal tax and employment laws), with limited, if any, financial education and training.  Her loyalty was 'purchased' by Elting in the form of exorbitant raises, bonuses and loans.  Although Boodram had no college degree, and the Company had a recommendation from an outside consultant that Boodram was not qualified for her job duties and was an undocumented worker, Elting still tried to secretly forge board organization documents to promote Boodram to Company Treasurer.

42. As a result of her total disregard for the well being of the Company, in the spring of 2013 TransPerfect did not have enough funds in the TPG operating account to pay Elting's enormous personal tax bill.  Undeterred, Elting, with the assistance of Boodram began to move vital funds from various bank accounts all around the world into the TPG account against Company policy and without the required consent and approval of Shawe.  Trujillo expressed his objection to the violation of Company policy and pointed out that the Company would not be able to meet its minimum capital requirements rendering the Company incapable of meeting its financial obligations in the normal course.  In fact, vendor payments had to be put on hold for several months due to the lack of liquidity.

43. This objection by Trujillo, who was simply carrying out his fiduciary duty to the company, not surprisingly infuriated  Elting.  Ms. Elting did not believe that she had any personal responsibility to pay her own taxes and that the company should cover the cost no matter what harm it caused.

44. By mid-October of 2013, Elting's 'corporate divorce' strategy intensified when she retained outside professional advisors, Kidron Advisors, and the law firm of Kramer Levin. The engagement of such assistance was done with typical Elting deceit. Although she hired them to work expressly on her behalf, she originally paid them collectively $159,000 in secret and without the consent of Shawe with Company funds under the guise of working on a buy-sell agreement with Shawe. When Shawe discovered the inappropriate payment, Elting stated that the payment was made on the advice of the company accountant.  When the accountant, a childhood friend of her husband and who had served as her personal accountant for close to 15 years, denied advising as such, she immediately sought to sever his relationship with

The Company as its tax accountant. The message was clear. Anyone who got in the way of Elting's money grabs would be a target of retaliation.

45.     Executing on the schemes Elting and her advisors concocted, Elting intentionally began to put more stress on the Company with a brazen disregard for her fiduciary duty to the Company. Given the strength of the management team, the company has weathered the storm continuing to be successful and continually setting performance records, but it has come at a high price and may not be sustainable. Ms. Elting, Kidron Advisors, Mark Segall, her husband Michael Burlant ,Kramer Levin and Ron Greenberg are all defendants in related lawsuits. They are being sued for aiding and abetting and conspiring to commit fraud as well as breaches of fiduciary duty in Supreme Court New York County by both Shirley Shawe, the third shareholder and Mr. Shawe.[2]

46.     In October of 2013, an important acquisition target, Vasont Corporation, which Shawe had been working on for many months was about to close. Vasont provided multi-layered content management systems, solutions and software which Shawe deemed to be very important to the Company. At that time, Elting conditioned her approval of the acquisition on an immediate shareholder distribution of $4 million. Essentially, Elting was holding the Vasont acquisition hostage in exchange for another distribution payout. This was nothing more than extortion and consistent with Elting's pattern of greed, selfishness and disregard for her fiduciary responsibility.

---

[2]This conduct led to the filing of three lawsuits in New York County Supreme Court against Kramer Levin, Elting's husband Michael Burlandt and Kidron Advisors, all alleging breaches of fiduciary duty. The actions are entitled: (1) *Shawe v. Elting, Kramer Levin & Greenberg*, 153375/2016; (2) *Shawe v. Kidron Advisors*, 652482/2016; and (3) *Shawe v. Cushman Wakefield & Burlandt*, 652664/2016

47. Shortly thereafter, in December of 2013, Elting made a global requirement to put all M&A activity on hold unless Shawe agreed to sizable quarterly distributions. By February of 2014, Elting stated that she would refuse to consider any M&A activity until her distribution demands were met. Such approach resulted in at least nine important acquisitions being lost, which could have greatly increased the revenues and earnings of the Company. This was particularly harmful to the Company since; (1) from January 2009 through October 2014 more than 15% of the Company's annual revenues had been earned by acquired businesses; and (2) the acquired technologies led to significant efficiency improvements.

48. During June of 2014, the Company's London office growth had led to a desperate need for additional space.  The London office was the third largest revenue producing office of the Company and was critical to the Company's rapid growth in Europe. For many months it was clear that the London office space was inadequate and there was a desperate need for more space to accommodate the employees to fulfill the Company's projects. Cushman & Wakefield was the real estate firm handling the search for new space, headed by Elting's husband, Michael Burlant. Things at the London office were so bad that valuable people were already working from home because of the lack of space and it was projected that an additional 25 more employees would have to do so if additional space weren't quickly found.

49. During that time Elting was working hard on getting a buy-sell agreement with Shawe, so she decided to block the London lease approval unless Shawe agreed to her requests for a buy-sell agreement. In this regard, she wrote to her husband Michael Burlandt ("Burlandt"), an employee of Cushman Wakefield (one of TrnasPerfect's real estate brokers), "*How should I handle? What about we require a buy sell agreement... in order to move forward*."  Elting then blocked the lease approval and asked Burlant (her husband) to, "delay doing anything

for the Company in London."  Burlandt complied  and blocked the deal from going through

costing the company close to $500,000 in damages as is alleged in the *Shawe v. Cushman*

action cited above.

50.     While many of the foregoing selfish and deceitful acts of Elting were directed against

Shawe, Elting was also acting in a similar fashion against those considered not to have

total allegiance to her - most notably Trujillo.  Elting made it clear to Trujillo that he was

getting in the way of her scheme and that he would pay the price.

## WAGE AGREEMENT WITH TRUJILLO

51.     For most of 2013, Trujillo attempted to meet with Shawe and Elting regarding his

compensation.

52.     In June of 2013, Trujillo finally met with Shawe and Elting to finalize his compensation

package for 2013 and thereafter.  The meeting took place at the Company's New York

City offices, and Trujillo brought a printed summary outline to the meeting setting forth

his salary payments, end of year non-discretionary payments, bonuses and phantom stock

payments.

53.     At the meeting, it was agreed by Trujillo, Shawe and Elting that Trujillo would receive:

(i) a minimum salary of $250,000 for 2013 (including a minimum of $25,000.00 end of

year payment); (ii) a performance bonus for 2013 with a minimum  value of $7000  and

potential for more than twice that; (iii) an annual raise which was later established at

7.5% per year (Trujillo's compensation had increased at an average rate in excess of 8%

annually throughout his tenure at the Company) ; (iv) an end of year non-discretionary

payment of $25,000 for every year that he is still employed by the Company; and (iv) full

appreciation value for "phantom stock".

54. Phantom Stock was an incentive plan put in place by Shawe and Elting. Plaintiff had received 528 shares of Phantom Stock.

55. In 2008, 2010 and 2012, Plaintiff had received payments against his shares of the Phantom Stock. Shawe and Elting agreed that in order to keep Plaintiff incentivized, Plaintiff would maintain his 528 shares of Phantom Stock, and would receive payment for any increase in the value of the shares above the price at the time of the prior distributions.

56. As of January 1, 2016, the shares were worth $580.83 per share, reflecting an incremental value due Plaintiff of $158,131.08.

57. In connection with such agreement, notations were made on the summary outline by Shawe reflecting their collective consent to such agreement (the "2013 Agreement").

58. Notwithstanding the 2013 Agreement, Elting prevented the payments to Trujillo because of his complaints regarding the company's failure to pay him the compensation due him. Elting's refusal to pay Trujillo were a direct result of his objections to and reports of her various breaches of fiduciary duty. Trujillo made it clear to her that he only acted in what he considered to be the best interests of the Company in accordance with his fiduciary duties and the established 'Core Values' of the Company.

59. In December of 2013, Elting stated to Trujillo that if he did not agree to all of her demands, regardless of Shaw's perspective, Company policies and directives, and/or his fiduciary duties, she would limit his pay and the pay of his large staff.

60. Specifically, she stated, "You're going to look really silly when there are no raises for you and your staff in March."

61. At the beginning of 2014, Plaintiff did not receive the promised $25,000.00 2013 year end payment. Plaintiff began to complain and was advised that it was being handled.

62. As the weeks passed, and Plaintiff did not receive his payment, he continued to complain. These verbal complaints and e-mails were ignored.

63. On January 6, 2014, in retaliation for Plaintiff continuing to inquire about his pay, Elting attacked Plaintiff several times both in person and on the phone. Elting berated Plaintiff (in front of other employees), threatened his job and career and stated that she, "didn't have to pay [Plaintiff] a dime".

64. Elting has continued to refuse to honor the 2013 Agreement.

65. As a result of Plaintiff's persistent demand for payment, Plaintiff has been the victim of a pervasive pattern of harassment and retaliation including defamatory comments, the stripping of his responsibilities, refusing to provide timely raises to his staff, and other retaliatory abuse and humiliation.

66. Specific acts of retaliation against Plaintiff by Elting include:

   a. Directing several of Plaintiff's direct reports that Plaintiff had no authority over them, that Plaintiff was no longer their supervisor, and that Plaintiff was about to be fired;

   b. Elting attempted to publically fire Plaintiff in retaliation for his complaints about the withholding of his compensation, despite knowing she did not have authority to do so, as only the Board of Directors can terminate Plaintiff. This was nothing more than a act of intimidation, and public humiliation;

   c. Elting sent an e-mail to a large distribution list stating Plaintiff had been terminated;

d.      Elting asked HR to escort Plaintiff from the building;

e.      Elting threatened to call the police and have Plaintiff forcibly removed from the building in front of staff;

f.      In the presence of at least 40 employees that report to Plaintiff, Elting yelled at and berated Plaintiff for over 15 minutes, including comments that he is, "a bitter little man because he has never been successful at anything";

g.      Elting removed money from the bank accounts of employees by having ADP execute a "reverse payroll".  The money was removed from their accounts in retaliation for Plaintiff's complaints regarding his own payroll issues as the employees were Plaintiff's direct reports and Elting wanted Plaintiff to be "embarrassed" because his staff did not get raises.  Elting made good on her earlier threats;

h.      Elting falsely advised a Ford dealership (Meadowlands Ford) that Plaintiff was trying to purchase a vehicle for the Company with a stolen check;

i.      Elting falsely advised Kevin Obarski that Plaintiff was a "criminal" and had "committed fraud";

j.      Elting falsely advised senior staff members that Plaintiff was "going to jail for fraud";

k.      Elting falsely advised Plaintiff's direct reports that Plaintiff, "is evil".

l.      Elting initially refused to pay Plaintiff his typical reimbursements, stating she was, "not going to pay him a penny";

m.      Elting tried to remove Plaintiff as a signatory on Company bank documents;

n.      Elting reassigned major projects that should have been under Plaintiff's purview to other employees;

o.      Elting prohibited Plaintiff from speaking with her directly; and

p.      Elting refused to allow Plaintiff to properly staff his department;

67.   In addition, through January 1, 2016, Plaintiff has not received compensation owed him including:

a.      $25,000.00 2013 end of year payment;

b.      $7,000.00 2013 performance bonus;

c.      $16,975.00 (7.5%) raise for 2014;

d.      $25,000.00 2014 end of year payment;

e.      $18,140.63 (7.5%) raise for 2015

f.      $25,000.00 2015 end of year payment

g.      $158,131.08 in phantom stock value

68.   In addition, more money is owed Plaintiff for 2016.

69.   Eltings behavior not only violated law, but violated her much touted Company "core value"[3] of "respect" and Elting's often used hollow mantra of "Integrity."

---

[3] The Company's website sets forth very clearly the high ideals of the Company in creating an inspiring ethos regarding all that it does by setting forth the following Core Values: Integrity, Own It, Urgency, Respect, Teamwork, Diversity, and Financial Responsibility.  Elting's behavior has strikingly violated at least two of them: Integrity and Respect: "Exhibit the Utmost Integrity - We believe that there is no more important trait in business and life than integrity.... It is of the utmost importance that we unfailingly conduct ourselves ethically and honestly and commit to always doing the right thing, no matter how difficult that may be....".  "Treat Everyone with Respect - Respect must be given before it can be earned, and it is highly contagious. We commit ourselves to always treating everyone with whom we interact - from our clients to our co-workers to our vendors to our business partners - with the ultimate level of respect."

70. On or about April 1, 2014, Plaintiff made a formal complaint regarding his wages, and the retaliation and harassment he was subjected to at the hands of Elting.

71. In addition, Plaintiff caused his legal counsel, Wayne Outten, Esq. to raise these issues with the Company.

72. These complaints were ignored and no remedial measures were taken.

73. In fact, the retaliation described above only intensified.

74. Following these complaints, Elting refused to reimburse Plaintiff for further business expenses and escalated her conduct, including berating Plaintiff.

75. In 2015, in retaliation for Plaintiff's complaints, Elting began a new campaign of atrocious and outrageously false allegations aimed at embarrassing and humiliating Trujillo. It was clear that Elting was intent on carrying out her personal vendetta on Trujillo. As part of the continued retaliation, Elting accused Plaintiff of incompetence and insubordination and made many other false claims. Elting's actions resulted in the Board of Directors hiring (at the company's wasted expense) of several individuals to assume certain aspects of Trujillo's position. Elting is attempting to constructively and actively demote and humiliate Trujillo in an attempt to make the working environment so uncomfortable for him that it will force him to resign.

76. Plaintiffs's complaints finally resulted in the Company conducting an "investigation" in late 2015 and early 2016. This investigation was a sham. The Company's "investigation" into Plaintiffs's complaints was totally superficial and did not even afford Plaintiff an opportunity to explain the events.

77.  While Plaintiff was told the investigation was to investigate Elting's abuse, harassment and retaliation, yet witnesses identified by Plaintiff were never spoken to.  Plaintiff requested a copy of this investigation report, and was refused.

78.  Not only were no remedial measures taken, Plaintiff was further retaliated against by having the court appointed Custodian's "outside" team of business advisers, Alvarez and Marsal, effectively take over part of Plaintiff's responsibilities as Chief Operating Officer.  Their fees are now in the millions of dollars.

79.  In addition, in early 2016, the Company hired a new employee to take over more of Plaintiff's responsibilities.

80.  Upon information and belief, during the time the Company refused to pay Plaintiff its agreed upon raises and non-discretionary bonuses, the new employee received a base salary of  $175,000.00 with quarterly bonus of $8,750.00 per quarter, for an annual total of $210,000.00.  In addition, if the new employee is terminated by TransPerfect during the first 18 months of service, he is entitled to receive a bi-weekly severance amount of $6,230.77 per pay period for six months, or $81,000.00.

81.  This employee was hired to take away part of Plaintiff's job that Plaintiff successfully undertook for 17 years, with a compensation plan close to Plaintiff and a severance package that Plaintiff does not have.  Despite the fact that his compensation package is nearly equal to Plaintiff, he is only doing one aspect of Plaintiff's job.  Plaintiff has the remainder of his responsibilities including supervision of staff and management of accounting, legal, travel and other departments.  To make matters worse the new employee was promised a bonus if he were to meet certain goals such as, "meeting with brokers".  It is hard to believe that such a basic task would be considered a goal in a

contract.  This is all during a time Plaintiff has unsuccessfully fought for the compensation promised him in 2013.

82. The isolation of Plaintiff has continued into this year.  Upon information and belief, as recently as May 23, 2016, many of the senior management participated in a conference call.  The only known members of senior management not invited on the call was Plaintiff and Yu-Kai Ng.  Mr. Ng recently brought suit with similar allegations in the Superior Court of the State of California, County of Santa Clara, bearing docket number 16-cv-292623.

83. On June 6, 2016, Plaintiff requested a meeting to set goals and objectives for the new real estate employee.  At the meeting, Plaintiff was told that he did not have supervisory responsibility over this employee, that the new employee was hired to be Director of Real Estate.  Plaintiff asked if he was being demoted and was advised, "I guess that's one way to look at it".  Clearly, anyone with complaints against the Company are isolated, excluded and retaliated against.

84. As a result, Plaintiff has suffered substantial economic losses.

### FIRST CAUSE OF ACTION AGAINST DEFENDANTS
**(Unpaid Wages in Violation of the FLSA against TransPerfect)**

85. Plaintiff hereby repeats and realleges each allegation contained in paragraphs numbered 1 through 84, as if fully set forth herein.

86. Defendants were the employer of Plaintiff within the meaning of the FLSA.

87. Defendants failed to pay Plaintiff the agreed upon wages as is required by the FLSA.

88. Defendants were aware or should have been aware that the practices described in this Complaint were unlawful and it has not made a good faith effort to comply with the

FLSA with respect to the compensation of Plaintiff.

89.     As such, Defendants' noncompliance with the  FLSA was willful.

90.     As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered and

continues to suffer economic damages in the form of unpaid wages in an amount to be

determined at trial and is entitled to recover the value of those unpaid minimum wages

plus an equivalent amount of liquidated damages pursuant to the FLSA, plus interest,

costs, attorneys' fees and punitive damages.

**SECOND CAUSE OF ACTION AGAINST DEFENDANTS**
**(Retaliation in Violation of the FLSA against TransPerfect)**

91.     Plaintiff hereby repeats and realleges each allegation contained in paragraphs numbered 1

through 90, as if fully set forth herein.

92.     The acts of Defendant toward Plaintiff were retaliatory in violation of the FLSA.

93.     Defendants were aware or should have been aware that the practices described in this

Complaint were unlawful and it has not made a good faith effort to comply with the

FLSA with respect to the compensation of Plaintiff.  As such, Defendants'

noncompliance with the FLSA was willful.

94.     As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered and

continues to suffer economic and other damages and is entitled to recover his damages in

an amount exceeding the jurisdictional minimum of this Court, plus interest, costs,

attorneys' fees and punitive damages.

**THIRD CAUSE OF ACTION AGAINST DEFENDANTS**
**(Unpaid Wages in Violation of the New York Labor Law against TransPerfect)**

95.     Plaintiff hereby repeats and realleges each allegation contained in paragraphs 1 through

94, as if fully set forth herein.

96.     Defendants were the employer of Plaintiff within the meaning of the Labor Law.

97.     Defendants failed to pay Plaintiff the agreed upon wages as mandated by the Labor Law.

98.     Defendants were aware or should have been aware that the practices described in this

        Complaint were unlawful and it has not made a good faith effort to comply with the

        Labor Law with respect to the compensation of Plaintiff.  As such, Defendants'

        noncompliance with the Labor Law was willful.

99.     As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered and

        continues to suffer economic damages in the form of unpaid wages in an amount to be

        determined at trial and is entitled to recover the value of those unpaid wages plus an

        equivalent amount of liquidated damages pursuant to the Labor Law, plus interest, costs,

        attorneys' fees and punitive damages.

### FOURTH CAUSE OF ACTION AGAINST DEFENDANTS
**(Retaliation in Violation of the New York Labor Law against TransPerfect)**

100.    Plaintiff hereby repeats and realleges each allegation contained in paragraphs numbered 1

        through 99, as if fully set forth herein.

101.    Defendants were the employer of Plaintiff within the meaning of the Labor Law.

102.    The acts of Defendant toward Plaintiff were retaliatory in violation of the Labor Law.

103.    Defendants were aware or should have been aware that the practices described in this

        Complaint were unlawful and it has not made a good faith effort to comply with the

        Labor Law with respect to the compensation of Plaintiff.  As such, Defendants'

        noncompliance with the Labor Law was willful.

104.    As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered and

        continues to suffer economic and other damages and is entitled to recover his damages in

an amount exceeding the jurisdictional minimum of this Court, plus interest, costs, attorneys' fees and punitive damages.

### FIFTH CAUSE OF ACTION AGAINST DEFENDANTS
**(Unpaid Compensation against TransPerfect)**

105. Plaintiff hereby repeats and realleges each allegation contained in paragraphs numbered 1 through 104, as if fully set forth herein.

106. Defendants were the employer of Plaintiff within the meaning of the FLSA and Labor Law.

107. Defendants refused to provide compensation to Plaintiff pursuant to its agreement to pay Plaintiff certain compensation and benefits, as is detailed above.

108. As a proximate result of Defendants' unlawful conduct, Plaintiff has suffered and continues to suffer economic damages in the form of lost compensation in an amount to be determined at trial and is entitled to recover the value of those unpaid compensation plus an equivalent amount of liquidated damages and prejudgment interest, costs, attorneys' fees and punitive damages.

### SIXTH CAUSE OF ACTION AGAINST DEFENDANTS
**(Violation of Labor Law 195(1) against TransPerfect)**

109. Plaintiff hereby repeats and realleges each allegation contained in paragraphs numbered 1 through 108, as if fully set forth herein.

110. Defendants have failed to furnish to Plaintiff the information required by Labor Law § 195(1) at the time of his hiring or any time thereafter.

111. Due to Defendants' violations of the Labor Law § 195(1), Plaintiff is entitled to recover statutory damages from Defendant in the amount of $50.00 per workweek that the violation occurred, not to exceed $2,500.00, plus attorney's fees and costs of this action.

## SEVENTH CAUSE OF ACTION AGAINST DEFENDANTS
### (Breach of Contract against TransPerfect)

112.   Plaintiff hereby repeats and realleges each allegation contained in paragraphs numbered 1 through 111, as if fully set forth herein.

113.   Defendants agreed to pay Plaintiff a compensation package as detailed above.

114.   Defendants have breached their agreement by refusing to pay Plaintiff the agreed upon compensation.

115.   Due to Defendants' breach, Plaintiff has suffered damages in an amount exceeding the jurisdictional minimum of this Court, plus interst, costs and attorneys' fees.

## EIGHTH CAUSE OF ACTION AGAINST DEFENDANTS
### (Intentional Infliction of Emotional Distress against TransPerfect & Elting)

116.   Plaintiff hereby repeats and realleges each allegation contained in paragraphs numbered 1 through 115, as if fully set forth herein.

117.   Elting, on behalf of herself and TransPerfect, engaged in conduct that was extreme and outrageous, beyond the bounds of acceptable conduct in a civilized society.

118.   This conduct included, but was not limited to the constant threats against Plaintiff's job, the defamatory comments, the threats of criminal prosecution over acts that did not occur, the constant public yelling and berating of plaintiff, along with all of the allegations set forth herein.

119.   Her conduct was intended to, or could reasonably be foreseen to, cause a reasonable person serious emotional trauma.

120.   As a result actually caused severe and serious emotional distress for Plaintiff in an amount exceeding the jurisdictional minimum of this Court.

121.    As a result of this intentional conduct, Defendants are liable to Plaintiff for compensatory

damages, punitive damages, interest, costs and attorneys' fees.

       **WHEREFORE**, Plaintiff demands judgment against Defendants on each of its

causes of action, in an amount no less that $5 Million, plus interest, costs and attorneys' fees.

### JURY DEMAND

122.    Plaintiff demands a trial by Jury for this action.

Dated:  Garden City, New York
       June 10, 2016

                    Yours, etc.


                    _____
                    LAW OFFICES OF JASON L. ABELOVE
                    By: Jason L. Abelove, Esq. (JLA-5327)
                    Attorneys for Plaintiff
                    666 Old Country Road, Suite 303
                    Garden City, New York 11530
                    (516) 222-7000